# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LEON MCCLURE, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-03-0054 |
| | § | |
| VICE PRESIDENT, HUMAN | § | |
| RESOURCES, UNION CARBIDE | § | |
| CORPORATION, AS PLAN | § | |
| ADMINISTRATOR OF UNION | § | |
| CARBIDE CORPORATION SPECIAL | § | |
| SEVERANCE PROTECTION PROGRAM | § | |
| 13-1421730 (PLAN NO. 530), AND | § | |
| UNION CARBIDE SPECIAL | § | |
| SEVERANCE PROTECTION PROGRAM | § | |
| 13-1421730 (PLAN NO. 530), | § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

After being denied benefits under his employer's Special Severance Protection

Program ("SSPP" or "Plan"), Leon McClure brought an action under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against the SSPP and

the Plan Administrator seeking district court review of the determination of the SSPP's

appeals committee.  Pending before the Court are Defendants' Motion for Summary

Judgment and Supporting Brief ("Defendants' Motion") [Doc. # 48][1] and Plaintiff's

---

[1]     Plaintiff has filed a Response to Defendants' Motion for Summary Judgment [Doc. # 59], and
        a Supplemental Response to Defendants' Motion for Summary Judgment [Doc. # 68], to
        which Defendants have filed a Reply [Doc. # 79].

Amended Motion for Summary Judgment ("Plaintiff's Motion") [Doc. # 56].[2]  As an

alternative to summary judgment, Plaintiff has filed a Motion to Remand to the Plan

Administrator [Doc. # 72].[3]  Also before the Court are several evidentiary motions.[4]  Having

considered the parties' submissions, all matters of record, and applicable legal authorities,

the Court concludes that Defendants' Motion for Summary Judgment should be **denied** and

Plaintiff's Amended Motion for Summary Judgment should be **granted**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

For more than twenty-four years, Plaintiff Leon McClure worked for Union Carbide

Corporation ("UCC"), a chemical and polymers company.[5]  For at least some portion of

those years, McClure worked as the Senior Human Resources Manager for UCC's Texas

---

[2]     Defendants have filed a Response to Plaintiff's Motion for Summary Judgment [Doc. # 70], to which Plaintiff has filed a Reply [Doc. # 77] and Defendants have filed a Sur-Reply [Doc. # 84].

[3]     Defendants have also filed a Response to Plaintiff's Motion to Remand [Doc. # 80].  As explained below, Plaintiff's Motion to Remand is denied.

[4]     Plaintiff Leon McClure has filed a Motion for Reconsideration [Doc. # 69] of this Court's Memorandum and Order denying in part and granting in large part Defendants' Motion to Strike Inadmissible Deposition and Affidavit Testimony [Doc. # 67], to which Defendant has filed a Response [Doc. # 81].  Plaintiff has filed Objections to Exhibits to Defendants' Summary Judgment Response [Doc. # 76], to which Defendants have filed a Response [Doc. # 82].  Plaintiff has also filed a Motion to Exclude evidence attached to Defendants' Response to Plaintiff's Motion [Doc. # 77], to which Defendants have filed a Response [Doc. # 83].  These motions are discussed herein.

[5]     *See* Sequence of Events Leading to the Separation of LEM from Dow Chemical, attachment to Letter dated Jan. 17, 2002 from Leon McClure to Chip Bell, at 1, Exh. FF to Defendant's Motion ("Administrative Record"), at VPHR 117 ("Sequence of Events").  McClure submitted the Sequence of Events to Charles Bell in his request for SSPP benefits on January 17, 2002.  *See* Letter dated January 17, 2002, from Leon McClure to Charles Bell, Administrative Record, at VPHR 116.

City manufacturing facility (the "Texas City position").  *See id*. at 1.  McClure's position involved general human resources leadership for a plant that employed over 1,000 people. He directly supervised a staff of twenty-five human resources employees and several contractors, and was accountable for an annual budget that exceeded $1,500,000.  As a member of the Texas City plant management team, McClure was involved in management and planning for the plant.  While on weekend duty, he acted as plant manager and had the authority to shut down the plant if warranted.  The Texas City plant had an active union, and McClure was responsible for labor relations.  *See* Job Comparison, Administrative Record, at VPHR 12; Sequence of Events; Response to Dow Appeal Denial, Administrative Record, at VPHR 122; Exempt Job Data Sheet for Plant HR Manager, Administrative Record, at VPHR 134;  Letter dated September 10, 2002 from Ava Johnsey to Leon McClure, at 1, Administrative Record, at VPHR 2 ("Appeal Decision").

In August of 1999, the Dow Chemical Company ("Dow") announced its intent to purchase UCC as part of a stock transaction valued at $11.6 billion.[6]  Several months prior to the closing of the acquisition, Dow named one of its own employees as the anticipated replacement for McClure's Texas City position.  *See* Sequence of Events, at 1;  *see also* Letter dated June 19, 2002 from John Butler to Ava Johnsey; Summary of Discussion with Larry Washington, Administrative Record, at VPHR 137.  Subsequent to the announcement of McClure's replacement, in November 2000, McClure was offered an employment

---

[6]     *See*  Plaintiff's Amended Motion for Summary Judgment, Exh. C, at 87 (Dow's 2002 SEC Form 10-K, explaining UCC acquisition)

opportunity with El Paso Corporation, which he accepted "pending release by Dow at the time of the UCC/Dow closing."  Sequence of Event, at 1.

Also in November, 2000, Dow's North American Human Resources Geographical Leader, John Butler, offered McClure a transitional role outside of the Texas City facility (the "transition job").[7]  This position was to last between one and two years.  The transition job involved leading the human resources activities associated with the closure and integration of eight UCC sites in Houston, Texas.  The position was to be completed in a condensed time frame and required extensive human resources skill and knowledge.  There is no evidence, however, that the transition job involved the direct supervision of any staff, the management of any budget, or the responsibility for the operation of any manufacturing facility.  Although McClure had indicted a desire to stay with Dow, he received no indications he would receive a permanent Dow position, as several of his colleagues were offered.  Sequence of Events, at 1, Administrative Record, at 117.  McClure requested to be released from employment at the time of the Dow/UCC closing.  He wanted to take advantage of the El Paso opportunity, arguing that he would be 59 years old at the completion of the transition job and that it would be extremely difficult to find another senior

---

[7]     *See id.*; Letter dated Mar. 20, 2002 from Charles V. Bell to Leon McClure, at 1, Administrative Record at VPHR 113 ("Denial Letter"); Summary of Discussion with John Butler, Administrative Record, at VPHR 138; Letter dated June 19, 2002 from John Butler to Ava Johnsey, Administrative Record, at VPHR 139; Letter dated July 1, 2002 from John Butler to Ava Johnsey, Administrative Record, at VPHR 142; Letter dated July 11, 2002 from John Butler to Ava Johnsey, Administrative Record, at VPHR 143 ("Butler's Job Description").

human resources leadership position at that age.  *See id*.  Butler spoke with McClure by telephone on January 8, 2001, threatening McClure that he would lose his right to severance if he did not complete the transition job.  McClure expressed his frustration at his assignment to what he saw as the lower level transition job.  *See id*.; Letter dated June 19, 2002 from John Butler to Ava Johnsey, Administrative Record, at 139.

Prior to its acquisition, UCC adopted the SSPP, an ERISA "welfare plan maintained for the purpose of providing severance payments for active [UCC] employees" upon certain conditions.  *See* SSPP, Administrative Record, at VPHR 173.  The SSPP provided for severance for employees "who within two years after a Change in Control of the Corporation, (i) involuntarily separate from service or (ii) voluntarily separate from service because their duties, authority, responsibilities, pay or benefits are reduced . . .."  *Id*.[8]  The SSPP names the Vice President–Human Resources of the Corporation, or his designee, as "Plan Administrator."  *Id*. at 10, Administrative Record, at VPHR 183.  The SSPP gives the Plan Administrator authority to "adopt such rules as [the Administrator] may deem necessary for the proper administration of this Program."  *Id*.  The SSPP further provides that after a change in control, no amendment or termination of the Plan shall be effective with respect to any employee unless such employee consents in writing.  *Id*.[9]

---

[8]    Part (i) is referred to by the parties as the "Involuntary Separation Clause," and Part (ii) is the "Voluntary Separation Clause."

[9]    A pre-acquisition amendment to the SSPP, dated February 2, 2001, is signed by M. Kessinger, UCC's Vice President of Human Resources at that date.  *See* SSPP, at 12, Administrative Record, at VPHR 185.  The parties do not contend that the substance of the
                                                                                              (continued...)

Butler's offer of the transition job and its accompanying ultimatum forced McClure to make a "Hobson's choice":  take the transition job and earn a promise to receive severance at some unspecified time, while forgoing the permanent position at El Paso and perhaps ending his career; or, alternatively, forgo the severance he believed he was legally entitled to under the Voluntary Separation Clause of the Plan in order to secure the El Paso position. The UCC Vice President of Human Resources who had promulgated the SSPP amendment, Mal Kessinger, urged Dow to release McClure so that he could receive severance under the Involuntary Separation Clause.  *See* Letter dated July 1, 2002 from John Butler to Ava Johnsey, Administrative Record, at VPHR 142; Summary of Discussion with John Butler, Administrative Record, at VPHR 138; Sequence of Events, at 3.  Kessinger suggested other candidates for the transition job and even offered to do the transition job himself.  *See* Summary of Discussion with John Butler, Administrative Record, at VPHR 138.  Due to the lower level of the transition job, Kessinger's offer to do the job was deemed "a ridiculous proposal."  *See* Letter dated July 1, 2002 from John Butler to Ava Johnsey, Administrative Record, at VPHR 142.

Effective February 7, 2001, UCC  was acquired by Dow and became a wholly owned subsidiary.  *See* Deposition of Ava Johnsey, at 8-9.[10]  On February 8, 2001, McClure

---

[9]        (...continued)
amendment is relevant to the merits of this case.

[10]       The Court will consider a few select facts outside the Administrative Record bearing on a conflict of interest between Dow and the Dow employees who administered the Plan, and the UCC employees entitled to benefits under the Plan.  As explained elsewhere in this opinion, (continued...)

tendered his resignation to Butler, effective March 1, 2001, and thereby declined the transition job. *See* Letter dated February 8, 2001 from Leon McClure to John Butler, Administrative Record, at VPHR 27 ("resignation letter").  McClure's resignation letter complained that the transitional job offered to him had much less responsibility than his current job as the Senior Human Resources Manager of a large unionized manufacturing facility. *See id.* The resignation letter also stated that acceptance of the transitional role assigned by Dow would prevent him for taking another employment opportunity. *See id.* McClure's letter further expresses his opinions that Dow's action was "mean spirited."

Following submission of his resignation letter, McClure sought severance benefits under the Voluntary Separation Clause of the SSPP. The Plan Administrator, Charles V. Bell, Dow's Global Director of Compensation and Benefits, denied his claim by letter dated March 20, 2002 ("Denial Letter"). The Denial Letter states that "[w]hile the job that you were asked to do was admittedly different than the role you played pre-merger, Dow's opinion is that it would have made full use of your skills and experiences, your seniority, and

---

[10]    (...continued)
consideration of this limited evidence is permissible in light of the Fifth Circuit's recent observation in *Kergosiern v. Ocean Energy, Inc.,* 390 F.3d 346, 356 (5th Cir. 2004), that "[t]here is no practical way for the extent of [an ERISA plan] administrator's conflict of interest to be determined without . . . going beyond the record of the administrator."

Here, the Court refers to Johnsey's testimony merely to establish the structure of the transaction that resulted in a change in control of UCC. The transaction is referred to in many documents in the Administrative Record as a "merger". *See, e.g.*, Letter dated September 10, 2002 from Ava Johnsey to Leon McClure, at 1, Administrative Record, at VPHR 2. The transaction was actually a "stock-for-stock" acquisition whereby UCC merged with a subsidiary of Dow. Dow accounts for UCC as a pooling of interests, submitting consolidated financial statements for itself and UCC. *See* Plaintiff's Amended Motion for Summary Judgment, Exh. C, at 87 (Dow's 2002 SEC Form 10-K, explaining UCC acquisition).

your leadership presence." *Id.* at 1.

McClure appealed the Plan Administrator's decision.  The Dow SSPP Claims Review Committee (the "Committee") was comprised of Ava Johnsey, Dow's Global Director for the Human Resources Center for Mergers and Acquisitions and for Global Workforce Planning; Mike Lipscomb, Dow's Senior Human Resources Manager for West Virginia Operations (a former UCC employee); and Randy Croyle, Dow's Director for its Merger and Acquisition Technology Center.  *See* Affidavit of Ava Johnsey, ¶ 2.[11]  The Committee sought the input of Butler, the Dow human resources manager who had offered McClure the transition job and to whom McClure had tendered his resignation.  Butler told Johnsey that McClure "should not get the package.  Quite simply, we needed him to do a job and he quit. . . . If we cannot manage exit timing, we should not pay."  Letter dated June 19, 2002 from John Butler to Ava Johnsey, Administrative Record, at VPHR 139.  The Committee notified McClure of its decision to uphold the denial of severance benefits in a letter dated September 10, 2002.  *See* Appeal Decision.  The Committee's lengthy Appeal Decision concludes *inter alia* "it is the Committee's determination that the circumstances surrounding your decision to voluntarily resign from employment on February 8, 2001, only one day after the closing of the merger, do not meet the Plan's stated eligibility criteria for participation." *See* Appeal Decision, at 1.  The Court deems McClure's claims to challenge factual findings in the Plan Administrator's Denial Letter and the Committee's Appeal Decision.

---

[11]     The Court refers here to evidence outside the Administrative Record merely to establish the employment relationship of the Plan Administrator and Committee to Dow.  This evidence pertains to the conflict of interest issue.

McClure filed this lawsuit under ERISA on January 7, 2003.[12]  McClure filed a motion for summary judgment on the grounds that Dow's Plan Administrator and the Committee (collectively, the "Administrators") acted under a conflict of interest and misinterpreted and misapplied the Plan provisions in denying him benefits.  McClure contends that because the Plan Administrator acted under a conflict of interest, and because the SSPP does not confer discretion on the Plan Administrator, this Court should review his claim for benefits *de novo*.[13]  In the alternative, Plaintiff moves to remand the case to the Plan Administrator.

Defendants contend that this Court's review is limited to determining whether the denial of benefits was an abuse of discretion based on the record available to the Plan Administrator at the time of the decision to deny benefits.  On the merits of McClure's claim, Defendants seek summary judgment on the basis that the Court must review the Administrators' decision for abuse of discretion and that under that standard the Administrative Record contains sufficient support for the denial of benefits.

## II.   PLAINTIFF'S MOTION TO REMAND TO THE PLAN ADMINISTRATOR

As an alternative to summary judgment, Plaintiff has filed a motion to remand the case to the Plan Administrator.  In its Memorandum and Order dated December 21, 2004, this

---

[12]     McClure filed a First Amended Complaint on May 4, 2004 [Doc. # 30].

[13]     In support of his benefits claim, McClure submitted evidence outside of the Administrative Record, including deposition testimony of the Administrator, Charles ("Chip") Bell, and Claims Review Committee members Randy Croyle, Mike Lipscomb, and Ava Johnsey.  The Court granted in large part Defendants' Motion to Strike this testimony [Doc. # 67].

Court struck deposition testimony of the Plan Administrator and members of the Plan's Appeals Committee relating to the respective duties, authority, and responsibilities of McClure's Texas City position and the transition job he declined.  In reviewing the decision of an ERISA plan administrator, a court "[can]not admit new evidence for the purpose of resolving [a] dispute on the merits of the claim."  *Vega v. Nat'l Life Ins. Servs.,* 188 F.3d 287, 300 (5th Cir. 1999).  Plaintiff sought to use the stricken deposition testimony in part to prove that the transitional role offered to McClure involved reduced responsibilities, triggering the Voluntary Separation Clause of the SSPP.  Plaintiff now argues that his cause should be remanded to the Plan Administrator/Appeals Committee for consideration of "this new and important evidence."  *See* Plaintiff's Motion to Remand to the Plan Administrator, at 2.

First, it is difficult to characterize the deposition testimony of the Administrator and Appeals Committee members as "new evidence" that these same people should consider on remand.  Presumably, they considered their own views at the time of their initial determination.  It seems likely that what Plaintiff really seeks is to introduce into the Administrative Record affidavit testimony of McClure's UCC co-employees (and perhaps other evidence) relating to the respective duties, responsibilities, and authority of the Texas City and transition positions.  *See id.* at 5 n.2.  Plaintiff arguably could have succeeded in obtaining such a remand before *Vega. See Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 202 & n.5 (5th Cir. 1997) (where record did not support administrator's entitlement to summary judgment, district court could remand to plan administrator for additional factual

development upon motion of either party); *Offutt v. Prudential Ins. Co.*, 735 F.2d 948, 950 (5th Cir. 1984) ("[A] court must focus on the evidence before the administrator at the time his final decision was rendered . . .. If new evidence is presented to the reviewing court on the merits of the claim for benefits, the court should, as a general rule, remand the matter to the plan administrator for further assessment."); *see also Johnston v. Dillard Dept. Stores*, 1993 WL 21430, at *1 (E.D. La. Jan. 26, 1993) (same).

However, the Fifth Circuit made it clear in *Vega* that there is no longer any procedure by which either party can seek a remand to the Plan Administrator to add evidence – whether in deposition or affidavit form – to the Administrative Record.  The *Vega* court held "that the administrative record consists of relevant information made available to the administrator *prior to* the complainant's filing of a lawsuit."  *Vega*, 188 F.3d 287 at 300 (emphasis added) (also stating that "*[b]efore* filing suit, the claimant's lawyer can add additional evidence to the administrative record simply by submitting it to the administrator in a manner that gives the administrator a fair opportunity to consider it").  "[A]llowing the case to oscillate between the courts and the administrative process prolongs a relatively small matter that, in the interest of both parties, should be quickly decided. . . . [W]e have made it plain in this opinion that the claimant only has an opportunity to make his record before he files suit in federal court."  *Id.* at 302 n.13.[14]  *Vega* clearly precludes a remand to the Administrator

---

[14]     The *Vega* court added:

> In some special circumstances a remand to the administrator for further
> consideration may be justified. . . . We decline to remand to the administrator

(continued...)

merely for consideration of new evidence that an ERISA claimant failed to introduce in the administrative proceedings.    Therefore, Plaintiff's Motion to Remand to the Plan Administrator is **denied**.

## III.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P.  56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).  An issue is material if its resolution could affect the outcome of the action.  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.,* 290 F.3d

---

[14]    (...continued)
to allow [the administrator] to make a more complete record on [a disputed fact].  We want to encourage each of the parties to make its record before the case comes to federal court, and to allow the administrator another opportunity to make a record discourages this effort.

*Vega,* 188 F.3d at 302 n.13.

303, 310 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). In deciding whether a fact issue has been created, the facts and the inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Hotard v. State Farm Fire & Cas. Co.,* 286 F.3d 814, 817 (5th Cir. 2002). However, factual controversies are resolved in favor of the nonmovant "only when there is an actual controversy – that is, when both parties have submitted evidence of contradictory facts." *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999).

The party moving for summary judgment has the initial burden of demonstrating the absence of a material fact issue with respect to those issues on which the movant bears the burden of proof at trial. *Smith   v. Brenoettsy*, 158 F.3d 908, 911 (5th Cir. 1998).  The movant meets this initial burden by showing that the "evidence in the record would not permit the nonmovant to carry its burden of proof at trial." *Id.*  If the movant meets this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (quoting *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir. 1998)). A dispute over a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. (quoting *Smith v. Brenoettsky*, 158 F.3d 908, 911 (5th Cir. 1998)); *see also Quorum Health Resources, L.L.C. v. Maverick County Hosp. District*, 308 F.3d 451, 458 (5th Cir. 2002).

The nonmovant's burden is not met by mere reliance on the allegations or denials in the nonmovant's pleadings. *See Morris v. Covan Worldwide Moving, Inc.,* 144 F.3d 377,

380 (5th Cir. 1998); *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13

(5th Cir. 2002) (noting that "unsworn pleadings do not constitute proper summary judgment

evidence," quoting *Johnston v. City of Houston*, 14 F.3d 1056, 1060 (5th Cir. 1994)).

Likewise, "unsubstantiated or conclusory assertions that a fact issue exists" do not meet this

burden. *Id.* Instead, the nonmoving party must present specific facts which show "the

existence of a 'genuine' issue concerning every essential component of its case." *Id.* In the

absence of any proof, the court will not assume that the nonmovant could or would prove the

necessary facts. *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89,

92 (5th Cir. 1995), *revised on other grounds upon denial of reh'g*, 70 F.3d 26 (5th Cir.

1995); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l

Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

## IV.   ANALYSIS

### A.   Applicability of Summary Plan Descriptions

Before addressing the merits, the Court must resolve the parties' dispute over the

applicability to this case of several Summary Plan Descriptions ("SPDs") purporting to

describe the SSPP.[15] All the SPDs produced by Defendants purport to impose several

limitations upon the SSPP.[16] For example, the SPDs contain language that confers

discretionary authority on the Plan Administrator, which Defendants contend triggers an

---

[15]   SPD, Ex. 1 to Defendant's Response to Plaintiff's Motion; February 13, 2001 SPD,
Administrative Record, at VPHR 186; February 15, 2002 SPD, Administrative Record, at
VPHR 163.

[16]   All the SPDs noted above contain these provisions.

abuse of discretion standard of review for this Court.[17]

SPDs must, under ERISA, be made available to plan beneficiaries.  29 U.S.C. § 1022. It is unclear what, if any, SPD was in effect prior to the merger.  Two SPDs are in the Administrative Record: An amended and restated SPD promulgated February 13, 2001, a week after the Dow acquisition and five days after McClure tendered his resignation (the 2/13/01 SPD, Administrative Record, at VPHR 186); and another amended and restated SPD issued a year later, on February 15, 2002 (2/15/02 SPD, Administrative Record, at VPHR 163).  As the Court noted in its December 21, 2004 Memorandum and Order, the parties may not rely on these amended SPDs to alter the terms of the SSPP.  These SPDs were promulgated after the closing of Dow's acquisition of UCC and there is no evidence McClure consented in writing to them, as necessary for amendments to the Plan made after a change in control of the corporation.  SSPP, at 10.

---

[17]     The SPDs all state that the Plan Administrator

> shall have the full and complete discretion to administer and interpret [the] SSPP, make findings of fact, and make final and binding decisions with regard to all issues, including but not limited to such issues as eligibility and payment of benefits.  The Plan Administrator has the authority to delegate responsibility to other persons or committees in the Company, including a Claims Fiduciary who is to afford a full and fair review of any denial of a claim upon receipt of a timely request for review.

SPD, at 6, Exh. 1 to Defendants' Response to Plaintiff's Motion for Summary Judgment; 2/13/01 SPD, at 6, Administrative Record, at VPHR 191; 2/15/02 SPD, at 6, Administrative Record, at VPHR 166.

The SPDs also require an employee "actually terminate employment on the date required by the Company" in order to receive benefits.  SPD, at 2.  There is no textual support in the SSPP for this requirement.

Defendants recently submitted a document entitled "Summary Plan Description," which they claim was promulgated *before* the change in control of the corporation.  SPD, Exh. 1 to Defendants' Response to Plaintiff's Motion ("Recently-Produced SPD"). Defendants argue that this SPD confers discretionary authority on the Plan Administrator and requires that an employee "actually terminate" on the date "required" by Dow in order to receive benefits.  Plaintiff has filed a motion to exclude the Recently-Produced SPD.

The Court concludes that the Recently-Produced SPD is inadmissible and will not be received in evidence.  Defendants have not established the document's authenticity, materiality or relevance.  FED. R. EVID. 401, 402, 901.  The Recently-Produced SPD also lacks ordinary indicia of reliability.  It bears no date whatsoever.  Defendants inexplicably failed to include it in the voluminous Administrative Record submitted to the Court with the SSPP and the amended SPDs, which each prominently bear dates of issue.  The Recently-Produced SPD was not submitted to the Court with an affidavit verifying its authenticity or the date of its creation.  Although Defendants later submitted an affidavit of Teri Ferguson, a Senior Design Leader for Dow, with their response to Plaintiff's motion to exclude the Recently-Produced SPD, the belated affidavit is legally insufficient.  Ms. Ferguson previously worked as a Human Resources Manager for UCC.  She attests merely that the Recently-Produced SPD "was in existence" at UCC prior to the change in control of the company.  The affiant does not state that the document was issued formally by the Plan Administrator prior to the acquisition, or that McClure (or other UCC employees) were provided a copy before the change in control.  The affiant does not explain why the

Recently-Produced SPD was not in the Administrative Record, nor why it was never produced to Plaintiff in discovery or initial disclosures. The affiant and notary's signatures appear alone on the last page of the affidavit, despite the fact that there is room for the verifying signatures on the previous page with the information to which the affiant attests. Thus, the Court is not persuaded that the affiant signed the same version of the affidavit that was submitted to the Court.

Further, Defendants were under a duty to disclose the Recently-Produced SPD under Rule 26(a)(1)(B) of the Federal Rules of Civil Procedure, which requires a party to produce all documents that it may use to support its claims or defenses. Defendants suggested in their initial disclosures that they had produced the pertinent "Summary Plan Description." *See* Defendants' Initial Disclosures, at 3 (Exh. 2 to Plaintiff's Motion to Exclude). Moreover, Plaintiff formally requested in discovery "[a]ll drafts, whether formal or informal, of the Plan, regardless of when or by whom these drafts were created." *See* Plaintiff's Second Request for Production of Documents, at 14 (Exh. 4 to Plaintiff's Motion to Exclude). Having defined "Plan" in that request as including all summaries or restatements of the SSPP, *see id.* at 8, Plaintiff's request plainly encompassed the Recently-Produced SPD. Yet, Defendants did not produce the document until long after the close of discovery. Indeed, the Recently-Produced SPD was not disclosed until after the parties' summary judgment motions were filed. Defendants' failure to timely produce the Recently-Produced SPD warrants the penalty under Rule 37(c) that Defendants are not entitled to rely on the document now. To permit Defendants belatedly to divulge and rely on a document they claim is central to the

case without granting Plaintiff's attorney opportunity for discovery about the document would be fundamentally unfair.

The admissibility of the Recently-Produced SPD is largely an academic question in any event.  Had the Recently-Produced SPD had been timely disclosed Plaintiff would be entitled to rely on that document's express language.  The Recently-Produced SPD (and amended SPDs) all provide that "[*i*]*n the event of a conflict between the provisions of the SSPP described in this SPD, and the provisions described in the formal Plan document* [*the SSPP*]*, the formal Plan document will govern*."  Recently-Produced SPD, at 1 (emphasis in original).[18]  Defendants, as drafters of this language asserting the supremacy of the SSPP, are bound by the words they chose.  *See Hansen v. Continental Ins. Co.*, 940 F.2d 971, 981-82 (5th Cir. 1991) (stating that any ambiguity in an SPD "must be resolved in favor of the employee and made binding against the drafter"); *Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 542-43 (4th Cir. 1992) (employer which represented to its employees that the ERISA plan, and not the SPD handbook, governed questions about benefits could not repudiate that representation and rely on statements in the SPD purporting to confer discretionary authority on administrator); *see also Sturges v. Hy-Vee Employee Ben. Plan & Trust,* 991 F.2d 479, 480-81 (8th Cir. 1993) (ERISA plan administrator abused its discretion in interpreting plan to deny coverage where plan summary stated that plan controlled when summary and plan conflicted and where plan unambiguously afforded coverage, while summary was at odds with plan on issue).

---

[18]     All the SPDs offered by Defendants contain this language.

In sum, Defendants have not shown the Recently-Produced SPD to be relevant or material because that SPD is contradicted by the SSPP, bears no markings that allow it to be reliably dated or authenticated, was never disclosed, let alone made a part of the Administrative Record prior to Plaintiff's summary judgment motion, and because there is no evidence the Recently-Produced SPD was adopted by the Plan, issued, and distributed to the UCC employees prior to the acquisition.  The Court therefore holds that the Recently-Produced SPD is inadmissible in evidence, and will not be considered in the determination of what standard of review applies.  Plaintiff Leon McClure's Motion to Exclude the Recently-Produced SPD is **granted**.  In addition, as noted, the post-acquisition amended SPDs cannot bind Plaintiff because he did not consent to them in writing as required by the SSPP and because they also contradict the SSPP.  Therefore the Court will not consider any of the SPD documents in its interpretation of the Plan or in its determination of the proper standard of review.

**B.**     **Standard of Review of ERISA Benefits Determinations**

**1.**     **Review Standard Generally**

The parties dispute whether the SSPP promulgated and amended by UCC before the acquisition contains language that confers discretionary authority on the Plan Administrator.  The standard of review for an ERISA benefits determination is dependent upon the language of the controlling plan.  The United States Supreme Court has held that the denial of benefits under an ERISA plan is "reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to

construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989); *see also Lain v. Unum Life Ins. Co. of America*, 279 F.3d 337, 342 (5th Cir. 2002).

If the plan grants to the administrator  discretionary authority, the reviewing court applies

an "abuse of discretion" standard.  *Meditrust Financial Services Corp. v. The Sterling

Chemicals, Inc.*, 168 F.3d 211, 213 (5th Cir. 1999).

        The SSPP created by UCC gives the Plan Administrator authority to "adopt such rules

as [the Administrator] may deem necessary for the proper administration of this Program."

Contrary to Defendants' assertion, this language does not confer broad discretion upon the

Plan Administrator to carry out his duties.   "[A]n administrator has no discretion to

determine eligibility or interpret the Plan unless the Plan language expressly confers such

authority on the administrator."  *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 636 (5th Cir.

1992).   For an ERISA plan to grant this type of discretionary authority, the plan's express

language must be "unambiguous in its design to grant discretion regarding entitlements to the

fiduciary or administrator."  *Cathey v. Dow Chem. Co. Med. Care Program*, 907 F.2d 554,

559 (5th Cir. 1990).  Defendants do not cite any cases, and the Court has found none,

suggesting that plan language empowering an administrator to adopt "rules" necessary for

the "administration" of a plan confers discretionary authority upon the administrator to

interpret the plan in order to determine eligibility for benefits.  Although the Fifth Circuit has

not required use of any particular language to empower a plan administrator with discretion,

at a minimum, to confer such discretionary authority, a plan should convey that the

administrator is entitled to construe, interpret, or otherwise exercise discretion in

determinations of plan members' benefits eligibility or to interpret the plan.  *See Cathey,* 907

F.2d at 559 (concluding administrator had no discretionary authority where plan merely

authorized him to "correct any defect, supply any omission or reconcile any inconsistency

in, and to control and manage the operation and administration of the plan"); *see also, e.g.,*

*Tolson v. Avondale Indus., Inc.,* 141 F.3d 604, 607 (5th Cir. 1998) (administrator has

discretionary authority where plan allows him to "construe any and all issues of Plan

interpretation"); *Batchelor v. Int'l Bhd. of Elec. Workers Local 861 Pension & Ret. Fund,*

877 F.2d 441, 443 (5th Cir. 1989) (finding discretionary authority where trustees of plan

were given "full power to construe the provisions of [the plan]" and authority "to interpret

the Plan"); *Magee v. Life Ins. Co.,* 261 F. Supp. 2d 738, 749 (S.D. Tex. 2003) (Atlas, J.)

(plan conferred discretion on administrator by requiring "satisfactory proof" from claimant).

A court cannot imply discretionary authority.  *See Wildbur*, 974 F.2d at 636; *Cathey*, 907

F.2d at 558-59.

The SSPP in the instant case does not unambiguously and expressly grant the

administrators discretionary authority to interpret the SSPP, construe its terms, or determine

eligibility for benefits.  The SSPP does not even discuss these activities.[19]

Because the SSPP does not confer discretionary authority on the Plan Administrator

to interpret the Plan, the abuse of discretion standard does not apply to the Court's review

---

[19]     Even the February 2, 2001 amendment to the SSPP, promulgated less than a week before the
change in control of UCC, did not confer discretionary authority upon the Plan Administrator
to interpret the Plan.  *See* First Amendment to the SSPP, Administrative Record, at VPHR
184.

of the ultimate benefits determination.[20]   If an "ERISA-governed plan does not vest

discretionary authority with the plan administrator or fiduciary, . . . judicial deference

terminates, and eligibility determinations are reviewed *de novo*."  *Cathey,* 907 F.2d at 558

(citing *Bruch,* 489 U.S. at 114-15).

Under a *de novo* standard of review, the Court must interpret and apply the Plan

language "'in an ordinary and popular sense as would a person of average intelligence and

experience,' such that the language is given its generally accepted meaning."  *Wegner v.*

*Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997) (quoting *Todd v. AIG Life Ins. Co.*, 47

F.3d 1448, 1451 n.1 (5th Cir. 1995).  Where *de novo* review applies, federal common law

governs the construction of ERISA policy provisions.  *Wegner*, 129 F.3d at 818.  "[I]f plan

terms remain ambiguous after applying ordinary principles of contract interpretation [a court

is] compelled to apply the rule of *contra proferentum* and construe the terms strictly in favor

---

[20]   When the abuse of discretion standard applies to a court's review of an administrator's ERISA benefits determination, the Fifth Circuit utilizes a two-prong test.  First, the court determines the "legally correct interpretation of the [plan]."  *Lain*, 279 F.3d at 344 (quoting *Tolson v. Avondale Industr., Inc.*, 141 F.3d 604, 608 (5th Cir. 1998)).  If the administrator failed to give the plan "the legally correct interpretation, [the Court must] then determine whether the administrator's decision was an abuse of discretion."  *Id.* (quoting *Tolson*, 141 F.3d at 344).  "In applying the abuse of discretion standard, we analyze whether the plan administrator acted arbitrarily or capriciously."  *Id.* at 214 (internal quotations and citations omitted).  "When reviewing for arbitrary and capricious actions resulting in an abuse of discretion, we affirm an administrator's decision if it is supported by substantial evidence.  A decision is arbitrary only if made without a rational connection between the known facts and the decision or between the found facts and the evidence."  *Id.* at 215 (internal quotations and citations omitted); *Lain*, 279 F.3d at 342.  The administrator abuses its discretion if its decision is not supported by substantial evidence in the administrative record and is erroneous as a matter of law.  *Wilbur v. Arco Chem. Co.*, 974 F.2d 631, 646 n. 12 (5th Cir. 1992); *see also Vega*, 188 F.3d at 302 ("Without some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion.").

of the insured."  *Id*.

"Regardless of the administrator's ultimate authority to determine benefit eligibility, however, ***factual*** determinations made by the administrator during the course of a benefits review will be rejected only upon the showing of an abuse of discretion."  *Meditrust Financial Services Corp. v. The Sterling Chemicals, Inc.*, 168 F.3d 211, 213 (5th Cir. 1999) (emphasis added); *see also Harms v. Cavenham Forrest Indus.*, *Inc.,*  984 F.2d 686, 688 (5th Cir. 1993).  Thus, the Plan Administrator and the Committee's factual determinations will be reviewed under an abuse of discretion standard.  But, once the facts are determined, the Court will undertake *de novo* review of the Administrators' ultimate benefits conclusion based on those factual determinations.

### 2.    Admissibility of Extrinsic Evidence on Conflict of Interest Issue

The Court has concluded that the Administrators' ultimate determination of benefits will be reviewed *de novo*, and that the Administrators' factual determinations will be reviewed under an abuse of discretion standard.  Plaintiff contends that where an abuse of discretion standard applies, the Administrators are entitled to less deference because they acted under a conflict of interest.  The Fifth Circuit applies a "sliding scale" approach to benefits denials made by an administrator that is also the insurer.  *Vega*, 188 F.3d at 297; *Lain v. UNUM Life Ins. Co.*, 279 F.3d 337, 342-43 (5th Cir. 2002) (concluding abuse of discretion standard of review applied to administrator's findings of fact, but that the ultimate denial of benefits would be reviewed *de novo*; stating that "sliding scale" would be applied to the abuse of discretion standard where the administrator acted under a conflict of interest).

"The greater the evidence of conflict on the part of the administrator, the less deferential [the courts'] abuse of discretion standard will be." *Lain*, 279 F.3d at 343 (quoting *Vega*, 188 F.3d at 297). "When a minimal basis for a conflict is established, we review the decision with 'only a *modicum less* deference than we otherwise would.'" *Id.* (quoting *Vega*, 188 F.3d at 301) (emphasis added by *Lain*); *see MacLachlan v. ExxonMobil Corp.,* 350 F.3d 472, 479 (5th Cir. 2003, *cert. denied*, 541 U.S. 1072 (2004).

Under this "sliding scale" approach, "the existence of a conflict is a factor to be considered in determining whether the administrator abused its discretion in denying a claim. The greater the evidence of conflict on the part of the administrator, the less deferential [the] abuse of discretion standard will be." *Id.*; *see also Bruch,* 489 U.S. at 957. The existence of a conflict of interest does not alter the application of an abuse of discretion standard of review on the Administrators' findings of fact, but is a factor in a court's determination whether an administrator abused its discretion. *See MacLachlan,* 350 F.3d at 479 n.7; *Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1306 (5th Cir. 1994) (holding that court must "weigh [a] possible conflict as a factor in our determination of whether the plan administrator abused his discretion, instead of . . . altering the applicable standard of review"); *Sweatman v. Commercial Union Ins. Co.,* 39 F.3d 594, 599 (5th Cir. 1994) (holding that conflict does not change the standard of review, but should be weighed in determining whether administrator abused his discretion); *Salley v. E.I. DuPont De Nemours & Co.,* 966 F.2d 1011 (5th Cir. 1992) (holding that a conflict of interest required the court to more closely examine the denial of health care benefits under the plan).

In the instant case, UCC promulgated the SSPP, a severance package for employees to obtain compensation in the event they were involuntarily or voluntarily terminated from employment under certain conditions.  McClure contends that after the change in control of UCC, Dow put its own human resources employees in charge of the SSPP's administration. McClure contends that these administrators acted under a conflict of interest in two basic respects.  First, McClure alleges that Dow saved money to the extent its agents denied benefits to UCC employees.  More significantly, McClure also alleges that the Dow employees charged with administering the SSPP operated with a conflict of interest because they also acted as the human resources management team responsible for the integration of UCC into Dow.  These individuals had an incentive, McClure argues, to interpret the SSPP and construe facts in such a way as to deny benefits under the voluntary separation clause to all employees slated for "transition" positions; if UCC employees could not be coerced to complete their transition assignments, Dow – specifically, the very Dow human resources employees who also acted as Plan Administrators – could not effectively manage the integration.

The Court turns to an analysis of these conflict of interest contentions after addressing related evidentiary issues.

### 3.    Evidentiary Issues

Before the Court addresses the merits of Plaintiff's argument, there is a threshold issue: what evidence is admissible for the determination of whether a conflict of interest exists.  Plaintiff has filed a Motion for Reconsideration of this Court's December 21, 2004

Memorandum and Order, in which this Court granted in large part Defendants' Motion to Strike Inadmissible Deposition and Affidavit Testimony.  As the Court noted in that ruling, in a review of an administrator's ERISA benefits determination, "[o]nce the administrative record has been determined, the district court may not stray from it except for certain limited exceptions," such as to consider evidence relevant to interpreting the plan or relevant to explaining medical terms and procedures relating to the claim.  *Vega,* 188 F.3d at 299.  "[T]he district court is precluded from receiving evidence to resolve disputed material facts, *i.e.*, a fact that the administrator relied on to resolve the merits of the claim itself."  *Id.*  This approach serves the dual purpose of (1) preventing the district court from engaging in additional fact-finding; and (2) encouraging both parties to present to the administrator the evidence that best supports their case and to resolve the dispute at the administrative level.  *Id.* at 298.[21]

While Defendants' motion to strike deposition and affidavit testimony was under consideration, the Fifth Circuit issued *Kergosien v. Ocean Energy, Inc.,* 390 F.3d 346 (5th Cir. 2004).  The *Kergosien* court added to the list of certain limited exceptions for which evidence outside the administrative record can be considered in a court's review of an ERISA

---

[21]     Under the procedures set out by the Fifth Circuit, "the plan administrator has the obligation to identify the evidence in the administrative record and . . . the claimant may then contest whether that record is complete." *Vega,* 188 F.3d at 299 (citations omitted).  If the claimant submits additional information to the administrator and requests that the administrator reconsider his decision, that additional information should be treated as part of the administrative record.  *Id.* at 300 (holding that "the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it").

plan administrator's benefits decision.  In addition to use in interpreting a plan or explaining medical terms or procedures, extrinsic evidence can be considered, to a limited extent, if it bears on an administrator's conflict of interest.  The Court stated in *Kergosien*, "[t]here is no practical way for the extent of [an ERISA plan] administrator's conflict of interest to be determined without . . . going beyond the record of the administrator." *Id*. at 356.  An administrator is unlikely to place evidence of his own conflict in the record he assembles.

It serves no purpose, however, at the administrative level to require an ERISA claimant to introduce to the administrator evidence of the administrator's own conflict. Cases such as *Vega* reflect the Fifth Circuit's concern that the administrator be given "a fair opportunity to consider" all of a claimant's evidence on the merits of his claim. *Vega*, 188 F.3d at 300.  Because this policy is not served when claimants "dismiss[] the administrative process as a nuisance and place[] all their eggs in the litigation basket," *id.* at 299-300, new evidence on the merits of a claim cannot be submitted to a district court after the administrative proceedings are complete.  The fairness and finality of an administrative benefit determination is not enhanced by requiring a claimant to bring to a plan administrator's attention facts concerning that administrator or his employer – facts which, indeed, are irrelevant to the claim itself.[22]  *Kergosian* thus reflects the Fifth Circuit's

_____

[22]     As a practical matter, the submission of such evidence to the administrator may risk undermining the administrative process by implying to the administrator that his decision is not impartial, and by impliedly threatening civil litigation.

reasoned approach to this distinction and will be applied here.[23]

### 4.    Analysis of Conflict of Interest Issue

The limited extrinsic evidence received for this purpose shows that the Administrators were among a group of Dow executives responsible for the success of the human resources aspect of UCC's acquisition.  Charles Bell, the Plan Administrator who made the initial decision to deny McClure severance, was Dow's "head of compensation and benefits," a member of the "deal team" that orchestrated the acquisition of UCC, and possessed "oversight responsibilities for severance programs within Dow."  Bell Depo. at 9.  Bell also "worked on the integration process throughout" its implementation.  *Id.*  Bell "had a management role in terms of trying to make sure that the merger was well run."  *Id.* at 80.

The Committee that decided McClure's appeal was comprised of Ava Johnsey, Dow's Global Director for the Human Resources Center for Mergers and Acquisitions and for Global Workforce Planning; Mike Lipscomb, Dow's Senior Human Resources Manager for West Virginia Operations (a former UCC employee); and Randy Croyle, Dow's Director of its Merger and Acquisition Technology Center.  *See* Affidavit of Ava Johnsey, ¶ 2.  Croyle "was in charge of the integration for the merger," and saw his role on the Committee as "representing the integration effort in management."  Croyle Depo. at 3.  Ava Johnsey, the apparent leader of the Committee, "was [Dow's] HR functional lead for the Carbide integration."  Johnsey Depo. at 46.

As one might expect from a group of individuals responsible for overseeing a

---

[23]    Plaintiff's Motion for Reconsideration therefore is **granted in part**.

successful integration of two organizations, the SSPP Administrators clearly gave much consideration to the effect of their decisions on Dow's organizational objectives.  The Court does not suggest that the Administrators willfully abdicated their fiduciary responsibilities to the SSPP and its beneficiaries.  Still, it is clear that the Administrators' conflict of interest led them to overtly take into consideration in McClure's benefits decision factors not relevant under the SSPP.  For instance, in his initial denial of McClure's application for severance benefits, Bell asserted that "the very nature of any involuntary severance package is to provide transitional assistance to employees who are leaving at the company's behest and on the company's schedule."  *See* Denial Letter, at 1.  This statement completely ignores the second prong of the SSPP promulgated by UCC – the Voluntary Separation Clause – which provides that under certain circumstances, an employee who voluntarily leaves the company is entitled to benefits.  Throughout the Denial Letter, Bell focuses on Dow's needs and does not even mention the SSPP.  Bell's Denial Letter is signed in his capacity as "Global Compensation and Benefits, The Dow Chemical Company," not any capacity related to the SSPP.  Bell's letter actually speaks of "Dow's opinion" as to the merits of McClure's claim. *Id.*  In concluding McClure was ineligible for severance benefits, Bell remarked that his "selection [for the transition job] was handled in a manner that was consistent with company policy."

The Committee, in contrast, in the Appeal Decision affirming denial of McClure's benefits, did focus on the SSPP but, as discussed later in the opinion, misinterpreted the plain language of the Voluntary Separation Clause.  The Committee placed great emphasis on facts

that were irrelevant under the SSPP, such as facts that McClure had obtained employment with a competitor, and that he tendered his resignation "only one day" after the actual effective date of the acquisition.  The Committee's Appeal Decision is written on Dow letterhead, further reinforcing the impression that the Administrators identified themselves as representatives of Dow, rather than as agents of the SSPP, and were primarily concerned with representing Dow's, or their employer's, interests.

Defendants argue that only a *financial* conflict of interest could be relevant here.  It is true that some decisions address financial conflicts of interest.  *See Lain v. UNUM Life Ins. Co.,* 279 F.3d 337, 343 & n.7 (5th Cir. 2002) (conflict may exist where entity was both plan insurer and plan administrator); *Vega,* 188 F.3d at 296 (analyzing "financial incentives" to deny a benefits claim); *Lowry v. Bankers Life & Cas. Retirement Plan,* 871 F.2d 522, 526 & n.7 (5th Cir. 1989) (conflicts may arise when there is "a financial impact on the employer").  However, none of these cases holds that a conflict of interest *must* be financial to warrant consideration.  These cases merely point out that there may be a conflict of interest where administrators have a financial interest in denying a claim.  In fact, although financial conflicts of interest might be relevant, they may not, alone, be enough to create a conflict of interest:  "The mere fact that benefits claims are decided by a paid human resources administrator who works for the defendant corporation does not, without more, suffice to create an inherent conflict of interest."  *MacLachlan v. ExxonMobil Corp.,* 350 F.3d 472, 479 n.8 (5th Cir. 2003).  Thus, McClure's allegations of substantial organizational conflicts of interest are not only relevant, they may be necessary to establish a cognizable

conflict of interest on the part of the Administrators.

Defendants also argue that no financial conflict exists in the instant case, and that their decision to deny severance in this case has actually caused Dow to incur significant costs. Defendants have submitted extrinsic evidence indicating that an entity called the UCC Benefit Protection Trust is paying McClure's legal fees. *See* Affidavit of Ava Johnsey, ¶¶ 4, 5. Because any assets remaining in the Trust revert to Dow when the Trust terminates in 2012, Defendants argue, denial of benefits to McClure has resulted in the Trust incurring expenses that have reduced the amount of money that will ultimately revert to Dow.[24] Johnsey's affidavit does not establish that the Administrators had no financial conflict of interest. There is no evidence that the Administrators *knew* at the time of their decision that Dow would (indirectly) pay McClure's legal fees. The Trust assists employees in prosecuting only claims that have merit.[25] The fact that Kessinger, a member of the Trust Committee[26] and the UCC official who promulgated the amended SSPP,[27] has determined that McClure's claim has merit, actually tends to indicate that the Committee failed to

---

[24]   Plaintiff has filed objections to paragraph 4 of Johnsey's affidavit on hearsay and relevance grounds. The Court concludes that the testimony passes muster. It is relevant, and is not hearsay, because Johnsey is the SSPP's corporate representative. All three of Plaintiff's Objections to Exhibits to Defendants' Summary Judgment Response are **overruled**.

[25]   *See* Benefit Protection Trust, Exh. 1 to Defendant's Response to Plaintiff's Motion for Summary Judgment ("If the Committee determines that your claim has merit, then the Committee will assist you in obtaining a satisfactory resolution of your claim.").

[26]   *See* Denial Letter, at 3 (copied to "Mal Kessinger, Benefits Protection Trust Committee").

[27]   *See* First Amendment to the SSPP, at 12 (signed by M.A. Kessinger, Vice President, Human Resources, Union Carbide Corporation).

interpret the SSPP as UCC intended when the Plan was promulgated.

The Court concludes that there are both financial and organizational conflicts of interest here.  The evidence establishes that the entity that administered the SSPP also paid the SSPP's claims.  Benefits were funded from UCC general assets.  *See* Affidavit of Ava Johnsey, ¶ 3.  UCC is a wholly owned subsidiary of Dow.  *See* Johnsey Depo. at 8-9.  After the acquisition, Dow filed consolidated financial statements with the Securities and Exchange Commission combining the accounts of Dow and UCC.  *See* Plaintiff's Amended Motion for Summary Judgment, Exh. B, at 39-45, 52-53 (2001 SEC Form 10-K containing consolidated financial statements), Plaintiff's Amended Motion for Summary Judgment, Exh. C, at 66-74, 87 (same for 2002).  In this sense, the Administrators – Dow employees – were self-interested because their employer "potentially benefit[ted] from every denied claim." *See Vega,* 188 F.3d at 295.  Because of the financial and the organizational conflicts of interest held by the Administrators, the Court concludes that the Administrators' factual determinations should be reviewed with a degree less deference than applicable in the absence of any conflict of interest.

### C.    Legally Correct Interpretation of the Plan

In its denial of McClure's appeal, the Committee explained to McClure its understanding of the Voluntary Separation Clause.  The Committee stated that "the Voluntary Separation Clause . . . was designed (and has been administered) to cover" only the "group of individuals, who were confirmed in or offered *long term* roles."  Appeal Decision , at 3 (emphasis added).  By its terms, the Voluntary Separation Clause in the SSPP

provides severance for UCC employees who, within two years after the change in control of the corporation "voluntarily separate from service because their duties, authority, responsibilities, pay or benefits are reduced." SSPP, at 1, Administrative Record, at VPHR 173. The Committee tortured this language in the SSPP to conclude that "assignment to a temporary, transition role does not, regardless of the nature or level of that position, fall within the scope of the Voluntary Separation Clause," Appeal Decision, at 2, and that only "employees who voluntarily leave because their **long-term** employment opportunities have been compromised because of a reduction in their duties, authority, responsibilities, pay, or benefits" are entitled to severance under the Voluntary Separation Clause. *Id.* (emphasis added). Nothing in the text of the SSPP supports the Committee's distinction between offers for long-term and short-term roles. The plain, ordinary meaning of the Voluntary Separation Clause is that a UCC employee who voluntarily separates because his duties, authority, or responsibilities are reduced is entitled to severance, regardless of whether the position offered to the employee is temporary or permanent. No person of average intelligence would read into the Voluntary Separation Clause the limitations asserted by the Committee in its Appeal Decision affirming Bell's decision to deny McClure benefits. *See, e.g., Wegner,* 129 F.3d at 818 (under a *de novo* standard of review, the court is to interpret plan language "in an ordinary and popular sense as would a person of average intelligence and experience," and the language is to be given its generally accepted meaning). The explanation of the SSPP to UCC employees before the change in control supports the Court's interpretation and flatly contradicts Defendants' argument. A Power Point presentation advertising the SSPP

stated "SSPP is available to U.S. hourly and salaried individuals who, up to two years after the merger date, are released or offered a 'less than equivalent' position."  TSC-SSPP Power Point Presentation, Administrative Record, at VPHR 229.

It would be apparent to a person of average intelligence and experience that the Committee's interpretation is illogical and unfair to employees, in addition to being unsupported by the wording of the SSPP.  If the SSPP never provides for severance under the Voluntary Separation Clause for a person placed in a transition role, regardless of the duties, authority, responsibilities, pay, or benefits of the assigned transition role, then Dow could effectively avoid paying severance to any employee.  Rather than terminating an employee and incurring a severance obligation under the Involuntary Separation Clause, the Committee's position would allow Dow to place the employee in a low-level position at severely reduced pay for the duration of the transition job, for up to two years.  The employee would be forced to voluntarily separate, but according to the Committee's view, would not be eligible for benefits under the Voluntary Separation Clause.  Nor would the employee be eligible under the Involuntary Separation Clause, because he would not actually have been terminated.

It may be understandable that Dow's human resources professionals, such as the Administrators, charged with successfully managing the integration of two large, complex corporations, would want key employees to accept transition roles in order for Dow to implement the integration.  This does not, however, excuse the Administrators from applying the SSPP as it was written by UCC.  According to the Committee, "the plan was neither

intended as nor administered on a 'voluntary' basis." Appeal Decision, at 4.  The text of the

Plan created by UCC for its employees' benefit mandates otherwise.  The SSPP could have

made the distinction between permanent and transitional employees.  It did not do so.  The

Committee cannot informally read such an amendment into the SSPP.  The Committee erred

in interpreting the Voluntarily Separation Clause as entirely inapplicable to employees given

transitional positions.[28]

---

[28] The Court's conclusion that the Administrators' interpretation of the SSPP was legally incorrect would be the same even if the Court were to evaluate McClure's claim under an abuse of discretion standard of review.  Under the abuse of discretion standard, the Court must apply the test found in *Tolson v. Avondale Industr., Inc.*, 141 F.3d 604, 608 (5th Cir. 1998), and consider "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan."  The Court has held that the Administrators' interpretation is inconsistent with any fair reading of the SSPP's text.  Defendants argue that the Administrators gave the Plan a uniform construction, and that numerous costs would result from a different interpretation.  The parties present no probative evidence that the Plan was in fact interpreted in a consistent manner.  However, assuming there were such evidence, an administrator may not escape liability by consistently and uniformly ignoring the direct, clear language of a plan.  *See Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992) ("[W]hen [an administrator's] interpretation of a plan is in direct conflict with express language in a plan, this action is a very strong indication of arbitrary and capricious behavior.").  ERISA law does not allow an administrator to escape liability by wholly and uniformly disregarding plain plan provisions. The Court cannot bless the Administrators' interpretation of the SSPP as legally correct merely because of their widespread disregard of critical Plan language.

Defendants also argue that if the Court were to hold for McClure, Dow would have to consider the claims of every transitional employee who quit before the separation date contemplated by Dow.  This contention is unsupported.  First, the transition letters sent to selected employees required the employees to sign and return the letter to Dow.  The standard transition letter constituted a contract in which the employee consented in writing it the stated terms.  The letter notified the employee that if he were to "voluntarily leave (*i.e.*, quit) before the date the Company determines, [he] will not be eligible for the SSPP or any other severance program."  Sample Transition Letter, Administrative Record, at VPHR 199.  Thus, Dow's fears of widespread claims are unfounded.  Second, costs of paying severance to transitional employees whose duties, authority, responsibilities, pay or benefits are reduced
(continued...)

### D.    Analysis of Merits of Plaintiff's Claim for Benefits

McClure in this lawsuit seeks severance benefits denied by the Administrators under the Voluntary Separation Clause of the SSPP.  The Court makes a *de novo* review of the Administrators' ultimate benefits determination based on the Administrative Record, while giving some, albeit reduced, deference to the Administrators' factual findings.  Defendants' arguments on the merits of McClure's claim under the Voluntary Separation Clause fall into three basic categories.  Defendants argue that the Texas City and transition positions were different, but equivalent.  Defendants also argue that severance is available under the SSPP only to employees whose duties, responsibility, etc. "*are* reduced," and that McClure quit before he actually suffered any such adverse employment consequences. Finally, Defendants argue that McClure quit because he found a position with a competitor, not "*because* [his] duties, authority, responsibilities, pay or benefits" were reduced.

### 1.    Comparison of Texas City Position and the Transition Job

Defendants urge that this Court must give considerable deference to the Committee's "factual" finding that the transition job "did not, in reality, involve a reduction in duties, authority, or responsibilities, pay, or benefits at the time of the closing of the merger," and that the transition job "was of an equivalent if not greater level (especially in terms of difficulty and complexity) than [McClure's] pre-merger Texas City role."  Appeal Decision,

---

[28]       (...continued)
are not "unanticipated costs to the Plan."  Such costs are explicitly contemplated by the Plan. In any event, the extrinsic evidence, to the extent it was considered on this point, indicates that McClure is the only person offered a transitional role who sought severance on the basis of the Voluntary Separation Clause.  *See* Johnsey Depo. at 45-48.

at 3; *see Meditrust Financial Services Corp. v. The Sterling Chemicals, Inc.*, 168 F.3d 211, 213 (5th Cir. 1999) ("Regardless of the administrator's ultimate authority to determine benefit eligibility, . . . factual determinations made by the administrator during the course of a benefits review will be rejected only upon the showing of an abuse of discretion."). The Court concludes that there are in reality very few disputed *facts* entitled to deference; it is the application of these facts to the SSPP provisions and the ultimate benefits decision that the parties dispute. The Committee's factual determinations are reviewed under an abuse of discretion standard, and the Committee's ultimate coverage conclusion based on these factual determinations is reviewed *de novo*.

The SSPP requires that an employee be awarded benefits under the Voluntary Separation Clause if duties, authority, responsibility, pay, *or* benefits are reduced. The list is disjunctive – a significant reduction in ***any one*** of these dimensions qualifies an employee for benefits under the Voluntary Separation Clause. "Duties" in this context are commonly understood to mean "obligatory tasks, conduct, service, or functions that arise from one's position." WEBSTER'S NEW COLLEGIATE DICTIONARY 352 (1979). "Authority" is defined as "power to influence or command thought, opinion, or behavior." *Id.* at 75. "Responsibility," "something for which one is responsible," is in turn defined in relevant part as "liable to be called on to answer." *Id.* at 979. In short, one would expect a person with authority to have power – be it over money, people, or things. Conversely, a person with responsibility must answer to others. And in this context, duties are the tasks for which an

employee is responsible.[29]

The Committee did not differentiate among "duties," "authority" and "responsibilities," and primarily focused instead upon the substantial "complexities" presented by the transition job. *See* Appeal Decision, at 3 (citing "difficulty and complexity" of transition job); Job Comparison, at 1-2 (stating transition job involved "complicated group and individual employee situations" and "complexities" such as site closings, reduction in workforce, lack of site leadership teams, multiple cultures, a condensed time frame, and "unique HR transition processes"); Letter dated July 11, 2002 from John Butler to Ava Johnsey, Administrative Record, at VPHR 143 ("Butler's Job Description") (stating Houston integration involved "large and complicated site closings" with "different functions and business with significant employee impact"); Summary of Discussion with Les Uhlman, Administrative Record, at VPHR 144 (Leon McClure's replacement in Texas City position) (opining that transition job was "at least as complex" as post-acquisition Texas city position). Jenny Brozzo, a Dow professional responsible for Global Compensation and Benefits, whom the Committee called upon to evaluate the pay grades of the two positions, focused on the similarity of "the required skills between the two jobs." *See* Letter dated July 17, 2002 from Jenny Brozzo to Ava Johnsey, Administrative Record, at VPHR 149; *see also* Denial Letter (stating that "Dow's opinion is that [the transition job] would have made full use of your skills and experiences, your seniority, and your leadership presence"). The Court next

---

[29]    The parties agree that the transition job did not involve a reduction in pay or benefits. These elements are therefore not analyzed.

compares the elements of duty, responsibility, and authority with respect to the position McClure held and the transition job he was offered, attempting to avoid conflating authority and responsibility with the skills required for the performance of duties involving complex tasks.

The facts regarding the differences between the Texas City position and the transition job are largely undisputed.[30]  Both positions required extensive human resources expertise, and involved implementation and communication of human resources policies and work processes.  Both positions required the identification and resolution of employee issues.  However, the transition job resulted in: (1) complete elimination of McClure's authority to directly supervise twenty-five human resources staff and administrative personnel as well as several contractors[31]; (2) complete elimination of his authority to manage a budget between

---

[30]    There appears to be a minor dispute regarding the total number of employees at the eight sites that McClure would have been assigned to in the transition job.  The Job Comparison on page 2 lists 653 employees; this number also appears on the summary of Data from Day-1 Master File obtained from UCC, Administrative Record at VPHR 150.  The Job Comparison on page 1, in contrast, uses a figure of 1100 employees.  Dow attorney Jeffrey Koehlinger pointed out the discrepancy to Johnsey in a letter dated Sept. 5, 2002, Administrative Record, at VPHR 7, and the Committee apparently dropped all reference to the number of employees at the eight sites in its Appeal Decision.  Although the number of employees at the eight sites is not outcome determinative, the evidence reflects that 653 is very likely the correct number because this is the figure from UCC's Master File.

In his Sequence of Events, McClure lists the number of employees at the Texas City plant as "over 1000."  Sequence of Events, at 4.  UCC's Data from its Day-1 Master File lists the number of employees at Texas City at the relevant time as 1138.  Administrative Record, at VPHR 150.  Thus, McClure's general human resources leadership responsibility likely was reduced from 1138 employees to 653 employees, over 40 percent.

[31]    In any case, there is no evidence in the Administrative Record suggesting that the transition job involved direct supervision of any personnel.

$1.5 and $3 million[32]; (3) discontinuation of his authority as member of plant management team, including the power to act as Plant Manager while performing weekend duty; (4) elimination of his responsibilities for labor relations with the plant's active union; (5) discontinuation of his authority to shut down the entire plant if warranted; (6) elimination of his authority to participate in business decisions at plant involving "human asset" impact; (7) discontinuation of responsibility for providing consulting to plant clients; and (8) elimination of responsibility for assisting in planning the plant's staffing and human resources structure.[33]

The transition job did involve some duties and responsibilities not present in the Texas City position.[34]  There is no evidence, however, that the duties and responsibilities of the transition job carried the authority to directly supervise any staff, manage any budget, or oversee any operational facet of any facility.  As Plaintiff notes, Defendants attempt to dress

---

[32]    In any case, again, there is no evidence in the Administrative Record suggesting that the transition job involved any budget accountability.

[33]    *See* Job Comparison; Exempt Job Data Sheet for Plant HR Manager; Appeal Denial; Sequence of Events; Response to Dow Appeal Denial.

[34]    These duties, as described by the Committee, included: (1) responsibility for leading human resources activities associated with closure and integration of sites within two different company cultures in condensed time frame; (2) responsibility for directing elimination of entire departments; (3) responsibility for managing the "cultural/emotional" component of site closures and consolidations; (4) responsibility for "negotiating" with company leaders concerning planning and implementation of the integration; (5) responsibility for ensuring equity across employee groups within UCC and Dow; and (6) responsibility for handling situations including employee communication, leadership counseling, and change management.  *See* Job Comparison; Butler's Job Description; Appeal Denial.  The descriptions of the transition job responsibilities (in categories (1), (2), (3), and (5) especially) amount to a list of goals with no provision of authority to implement the goals.

up these responsibilities with vague, non-specific, ornamental language.  Defendants repeatedly describe the transition job as "complex."  Defendants' state that the transition job involved "different functions in business with a significant employee impact," "dialog [*sic*] and negotiation," "complicated group and individual employee situations," and "communication, leadership counseling, [and] change management," and implicated "mechanical" and "cultural/emotional aspects."  *See* Defendants' Motion for Summary Judgment, at 12 (quoting Butler's Job Description).  It is difficult to extract specific duties, responsibilities, and authority from these kinds of phrases.  Noting that an occupation includes "cultural/emotional aspects" or "complicated group and individual employee situations," or "communication" or "leadership" reveals nothing about the specific duties, responsibilities, or level of authority of the position.  In contrast, the Administrative Record reveals that the Texas City position involved a number of specific and concrete duties and responsibilities, as well as measurably greater levels of authority than the transition job.  The Plan does not allow the Administrators to deny severance merely because a former UCC employee's new role may sound impressive based on superlatives or adjectives that lack substance.  Moreover, the responsibilities in the transition job were, by definition, to diminish over time as the corporate integration proceeded.  The transition job involved the elimination of sixty-four percent of the combined companies' workforce at eight facilities, and transition tasks simplified as these worker reduction goals were achieved.  *See* Data from Day-1 Master File by UCC, Administrative Record, at VPHR 150.  By March of 2002, just thirteen months after McClure resigned, "the need for [the transition job was] winding

down." Denial Letter, at 1.

On the evidence in the Administrative Record, the Plan Administrator and the Committee plainly erred in concluding there had been no reduction in McClure's duties, authority, or responsibility. While McClure would have received some new responsibilities and duties in the transition job, the Administrative Record shows that his supervisory and budgetary authority was eliminated entirely. The SSPP provides for severance when an employee's duties, responsibilities, or pay are reduced. The addition of more duties and responsibilities, no matter how "complex," does not overcome the plain language that provides severance to an employee whose duties, authority, or responsibilities are reduced.[35] When Dow took away McClure's budget, staff, and membership on the plant management team, it eliminated material components of his authority. The additional general day-to-day responsibilities for administering the integration of workforces at eight Houston sites did not negate McClure's loss of that authority. *See Daubertin v. HCR Manor Care, Inc.,* 373 F.3d 822, 829 (7th Cir. 2004) (Posner, Easterbrook & Rovner, JJ.) (reduction of, among other things, executive's budget, management, and hiring and firing authority, constituted

---

[35]    Defendants also emphasize the fact that the person who ultimately filled the transition job had a higher "classification level" than McClure did, and that the transition job was rated by Dow at a higher level than McClure's Texas City position. The transition job, however, was staffed based on availability rather than the level required to do the job. *See* Letter dated June 19, 2002 from John Butler to Ava Johnsey, Administrative Record, at VPHR 139 (transition job eventually staffed with a high level employee who "otherwise would not have been on the payroll" had McClure accepted the transition job). In any case, the issue presented is not whether similar skill and knowledge levels were required for the respective positions, but whether McClure's duties, authority, or responsibilities were reduced, triggering severance benefits under the SSPP.

"reduction in the scope of a Participant's authority, position, title, functions, duties or responsibilities" so as to trigger severance benefits under ERISA plan, despite "addition" to position responsibility for daily visits to sites managed); *see also Bowles v. Quantum Chem. Co.,* 266 F.3d 622, 634 (7th Cir. 2001) (plaintiff entitled to severance under ERISA plan's voluntary separation clause because his budget was reduced and his supervisory duties eliminated).  Defendants have not specifically identified for the Court any evidence that proves that the transition job did not involve a reduction in McClure's duties, authority or responsibility when compared to his Texas City position.  *See Barhan,* 121 F.3d at 201-02. To prevail on summary judgment, an ERISA administrator bears "the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, affidavits or other factual support that demonstrate that it did not abuse its discretion in rejecting the beneficiary's claim.  Thereafter, the nonmovant . . . [must] set forth factual support in proper form tending to show that the plan administrator was not entitled to summary judgment and/or that the nonmovant was entitled to summary judgment."  *Id*. at 201-02.  Defendants have not identified probative admissible evidence establishing that McClure's transition did not entail a reduction in his duties, authority, or responsibility from his prior position with UCC.  In sum, the Court holds that the transition job Dow offered to McClure involved a significant reduction in duties, responsibility, and authority.[36]

---

[36]     Under an abuse of discretion standard of review – regardless of the amount of deference to which the Administrator's decision or fact finding are entitled – this conclusion would be the same.  The evidence in the record is uncontradicted that McClure suffered a loss of direct supervisory authority, budgetary authority, and the other authorities and responsibilities listed (continued...)

### 2.      Requirement of Performance of the Transition Job Before Invoking the Voluntary Separation Clause

Defendants argue that severance is available under the SSPP only to employees whose duties, responsibility or authority *"are reduced,"* and that McClure quit before he actually suffered any such adverse employment consequences.  This issue requires interpretation of the SSPP,  a legal question on which the Court will make a *de novo* review.  To the extent the Court reviews factual determinations based on the Administrative Record, the Court gives deference to the Administrators' determinations, but less deference than if the Administrators acted without conflicts of interest.

The Committee's Appeal Decision states that McClure turned in his resignation "only one day after the actual February 7, 2001 effective date of the merger, and before [he] had even been formally assigned or begun to work in, and thus even begun to understand or assess the actual level and scope of, the transition assignment [he] was being given." McClure left Dow before he received a formal transition letter notifying him of his status. Defendants argue that McClure only *suspected* that, at some point in the future, the transition job would result in a reduction of his duties, responsibility, or authority.  Defendants argue

---

36      (...continued)

above.  The Committee's decision therefore was an abuse of discretion.  *See Lain v. UNUM Life Ins. Co.,* 279 F.3d 337, 347 (5th Cir. 2002) ("[B]ecause there is a complete absence in the record of any 'concrete evidence' supporting [ERISA administrator's] determination that [plaintiff] is not disabled, the district court properly held that UNUM abused its discretion."); *Vega,* 188 F.3d at 302 (holding for ERISA claimant because "[w]ithout some concrete evidence in the administrative record that supports the denial of the claim, we must find the administrator abused its discretion"); *see also Barhan,* 121 F.3d 198 (holding, under abuse of discretion standard of review, that evidence in the "record [did] not sufficiently demonstrate the plan administrator's entitlement to summary judgment").

that such speculation is inadequate under ERISA law, *see Aboul-Fetouh v. Employee Benefits Comm.,* 245 F.3d 465, 473-74 (5th Cir. 2001) (speculation and subjective beliefs are insufficient summary judgment evidence in an ERISA case), as well as under the SSPP, which requires that severance payments be made once "duties, authority, responsibilities, pay or benefits **are** reduced." SSPP, at 1, Administrative Record, at VPHR 173. Defendants point to the dictionary definition of "are," which means "[t]o exist in actuality; have reality or life" or "[t]o take place or occur." THE AMERICAN HERITAGE DICTIONARY 126, 163 (2nd college ed. 1995). The Court is unpersuaded by Defendant's contentions.

While an ERISA plan must be construed literally as a written contract. *See Provident Life & Acc. Ins. Co. v. Sharpless*, 364 F.3d 634, 641 (5th Cir. 2004). The text of the SSPP does not require that McClure begin to perform the duties associated with the transition job in order to invoke the Voluntary Separation Clause. To the contrary, the SSPP, as amended before the acquisition, provides that an employee "offered a new position with the Company or Dow at or after the Closing Date and who accepts that position, will not be entitled at a later date to claim benefits under SSPP." First Amendment to the SSPP, at 1, Administrative Record, at VPHR 184. This clause does not exclude transition jobs. However, to the extent that transition roles were new jobs for employees, the contractual structure belies Defendants' contention that the SSPP requires that an employee assigned to a transition role actually perform the duties of that role before he may invoke the SSPP's Voluntary

Separation Clause.[37]  To do so would eviscerate the Voluntary Separation Clause, which UCC presumably intended to inure to the benefit of **all** employees whose positions were reduced in duties, authority, or responsibility.[38]

In any event, the evidence of record makes clear that the fact that McClure had not actually begun the transition job is immaterial in this particular case.  It is true that McClure had not yet received Dow's formal transition letter or commenced his new duties before he resigned.  The Administrative Record, however, leaves no doubt that Dow had definitively assigned McClure to the particular transition job, which Dow had described in some detail

---

[37]   Had McClure received the transition letter described by Defendants and returned it with his signature, as Dow required for an employee to formally begin an assigned transition job, he would have bound himself to the terms of that contract.  The standard letter sent to employees selected for transitional roles stated:

> If you do not accept this transition role or voluntarily leave (i.e. quit) before the date the Company determines, you will not be eligible for the SSPP or any other severance program.

Sample Transition Letter, Administrative Record, at VPHR 199.  Dow required that an employee sign and return the letter in order to accept the transitional role.  Whatever the legal validity under the SSPP of Dow's threat that an employee would not be eligible for severance if he refused the transitional role, *see supra* Part IV. C, when an employee agreed in writing to these terms, he became bound by them.  Thus, had McClure followed Dow's procedure and officially accepted and commenced the assigned transition job after the receipt and signing of a transition letter, he would unquestionably have been barred from recovery of benefits under the Voluntary Separation Clause if he resigned before the date set by Dow.  As explained elsewhere in the opinion, the transition job involved reductions in McClure's duties, authority and responsibilities when compared with the Texas City position.

[38]   Furthermore, the Court has concluded elsewhere in this opinion that the SPDs do not limit Plaintiff's rights under the SSPP.  Therefore, the fact that McClure never worked in a transitional role with Dow until "the date required by the Company," SPD, at 2, is not a bar to severance.  In any case, the SPD also provides that, as an alternative to terminating on the date required by Dow, an employee may receive severance if he "voluntarily terminate[s] for the permissible reasons described" in the Voluntary Separation Clause.  SPD, at 2.

to McClure prior to his resignation.  In the letter denying McClure's initial application for severance, Charles Bell stated that McClure's "employment situation with Dow was made clear approximately a month before the actual closing of the merger[,] . . . well in advance of Dow's stated intent to have everyone's status known and communicated within six months of the merger date."  Appeal Decision, at 1 (also stating that "the job level and the compensation package associated with the transitional position you were offered were both the equivalent of what you had"; and that "the job that you were asked to do was admittedly different than the role you played pre-merger"); *see also* Notes and Issues (L. McClure SSPP Appeal), Administrative Record, at VPHR 29 (asking whether "the fact that he was offered a 'transition role' (potentially before the Closing) matters)" and noting that transition role was "assigned"; Committee Notes, Administrative Record, at VPHR 30 (stating that "comparable position offered").  John Butler, the Dow executive who was to be McClure's supervisor in the transition job, told Committee member Ava Johnsey that "I told Leon that we had a very important job to do and that he was the right person to do the job and that I anticipated making him an offer to do the job as soon as it was appropriate."  Letter dated June 19, 2002 from John Butler to Ava Johnsey.  Although McClure did not give Butler an opportunity to extend a formal or "official" offer after the acquisition, Dow clearly had assigned the transition job to McClure before he resigned.  Butler continued in his email to Johnsey: "we needed him to do a job and he quit.  We staffed the job with an L3 level person which otherwise would have not been on the payroll."  *Id.*; *see also* Summary of Discussion with John Butler, Administrative Record, at VPHR 138 ("[T]he company wanted Leon to be

in a transition role as the HR Integration Leader for Houston."); *see generally* Job Comparison, Administrative Record, at VPHR 12  (comparing Texas City and transition positions).  As Defendants admit, " the transitional job had . . . existed for one day" at the time McClure tendered his resignation.  *See* Defendants' Response to Plaintiff's Motion, at 17.

McClure did not have to speculate about what the transition job would entail.  Butler had told him what the job involved.  Any doubts about the scope of the position were clarified at a meeting in Midland, Michigan, **before** the change in control of UCC.  *See* Response to Appeal Denial, at 1 (stating that the transition "role became quite clear to me after attending a joint Dow/UCC HR meeting").  Thus, Defendants' reliance on *Aboul-Fetouh,* 245 F.3d at 473-74, is unavailing.  In *Aboul-Fetouh*, the Fifth Circuit held that the ERISA plaintiff had not met his burden of coming forward with "concrete evidence" contradicting the defendant disability insurer's evidence of his residual capacity for work. *See id.*  Here, the Administrative Record is replete with concrete evidence concerning the respective duties, responsibilities, and authority of the Texas City position and transition job.

McClure resigned in response to Butler presenting the transition job to him with an ultimatum:  Do the transition job or suffer the consequences.[39]  Thus, McClure's assignment to the transition job was sufficiently definite that it can be said to "exist in actuality; have

---

[39]     *Compare Collins v. Ralston Purina Co.,* 147 F.3d 592, 600 (7th Cir. 1998) (concluding ERISA claimant was not entitled to severance benefits because employer had not yet re-assigned the plaintiff; instead, plaintiff "resign[ed] before the company's offer could become an ultimatum," and there was no evidence "that the company offered him the position on a 'take it or leave it' basis").

reality or life" and met the SSPP's requirement that McClure's duties be reduced prior to his resignation.[40]

### 3.        Reason McClure Resigned

Defendants argue that, even if McClure's job duties were reduced, McClure did not in fact resign for that reason.  In support of their conclusion concerning McClure's true intent, the Committee seized on McClure's statement in his resignation letter that, upon learning he would be replaced in his Texas City position, he "as a reasonable and prudent person found an employment opportunity" that the "assigned transitional role [would] prevent from occurring."  The SSPP allows severance under the Voluntary Separation Clause when an employee resigns "***because*** [his] duties, authority, responsibilities, pay or benefits are reduced."  SSPP, at 1 (emphasis added).  The Committee's letter explaining its denial of McClure's appeal reasoned that "you left employment, '*because* of' your need to pursue an alternative position outside of UCC that you believed would not have remained available had you remained with UCC in the transition role you were being assigned after that date." Appeal Decision, at 2.  The Committee further relied on the fact that McClure had not yet begun to perform the duties associated with the transition job.  The Committee's decision stated:  "it is simply not possible for you to have satisfied this 'because' requirement when

---

[40]        The Court's conclusion that the SSPP did not require that McClure perform the transition job in order to be eligible for benefits under the Voluntary Separation Clause would be the same under an abuse of discretion standard of review, regardless of the amount of deference to which the Administrators' decision or findings of fact are entitled.  The Administrators' interpretation of the Voluntary Separation Clause is arbitrary and capricious, and without support in the text of the SSPP.

you resigned because, *at that time*, you had not actually suffered any adverse consequence relating to your duties, authority, or responsibilities." *Id*. The Court finds these arguments unavailing.

First, nothing in the text of the SSPP absolves Defendants of their obligation to provide benefits under the Voluntary Separation Clause simply because an employee has successfully secured another position outside the company.   In addition, Defendants' conclusion – that McClure did not quit "because" his duties were reduced, but quit "because" he found a position with a competitor – is against the great weight of the evidence in the Administrative Record.   Throughout the administrative process, McClure has consistently contended that he is entitled to benefits under the Voluntary Separation Clause because the transition job involved a reduction in his duties, authority, and responsibilities.   McClure's resignation letter clearly states that

> it became readily apparent that the transition job had much less responsibility than my current job as HR manager of a large unionized manufacturing facility.   The current job required a great deal of independent judgment across several functions and activities.   UCC recognized this level of difference in its compensation program.

Letter dated February 8, 2001 from Leon McClure to John Butler, Administrative Record, at VPHR 27.   In his subsequent application for benefits under the SSPP, McClure reiterated that "clearly the level of authority and responsibilities [with the transition job] were well below his Texas City HR leader role."   Sequence of Events, at 4.   In his subsequent appeal to the Committee, McClure stated that "perhaps the most important argument . . . focuses on the plan itself," which "clearly states that an employee who is offered a position (transition

or permanent) with less responsibility and authority than the position held at UCC may decline that offering and continue to be eligible for the benefits described."  Response to Dow Appeal Denial, Administrative Record, at VPHR 122.  McClure explained that the transition "role became quite clear to me after attending a joint DOW/ UCC HR meeting in Midland the week prior to [the UCC/Dow] closing.  I do not want to undervalue this role, but when compared to my UCC position at the Texas City site, it simply did not have the authority and responsibility as previously addressed."  *Id*.

Thus, McClure consistently asserted that he resigned because the transition job represented a reduction in the authority and duties of his prior position at UCC.  Had he not secured another position (outside Dow and UCC), McClure may well have completed the transition job for his own economic reasons, given Dow's threat that severance was predicated on completion of that job.  *See* Sequence of Events, at 1 (stating that McClure initially "told Dow, that, for economic reasons, he would most likely have to accept this transition assignment").  However, the fact that the new outside job opportunity allowed McClure the luxury of rejecting Dow's ultimatum does not nullify the text of the Voluntary Separation Clause.

Further, the fact that an employee found another position is simply not relevant to his entitlement to severance under the SSPP.  The SSPP contemplates severance for employees who resign "because their duties, authority, responsibilities, pay or benefits are reduced." McClure was assigned to a transition job with clearly reduced authority and responsibility, reductions heightened by the fact that the job was of uncertain duration.  McClure does not

lose his right to severance simply because he was fortunate enough to find another position. The Committee erred in reading the Voluntary Separation Clause as inapplicable to employees who obtain other employment before voluntarily resigning. In any event, the record evidence does not support the Committee's self-serving interpretation of McClure's motivation.

In summary, McClure was entitled to rely on the plain, ordinary meaning of the SSPP language at the time he made his termination decision. The Committee's decision to deny McClure severance benefits was error because the decision contravened the ordinary, plain meaning of the SSPP language.[41]

The Committee already has considered and rejected all of McClure's arguments. The Court therefore may award benefits without a remand to the SSPP Administrator. *See Vega*, 188 F.3d at 302 n.13 ("We decline to remand to the administrator to allow [the administrator] to make a more complete record on [a disputed fact]. We want to encourage each of the parties to make its record before the case comes to federal court, and to allow the administrator another opportunity to make a record discourages this effort.").[42]

---

[41]    The same conclusion would apply if the Court were to use an abuse of discretion standard of review, regardless of the amount of deference to which the Administrators' decision and fact findings are entitled. The Committee's interpretation of the Voluntary Separation Clause as inapplicable to those who find other employment is arbitrary and capricious, and without support in the text of the SSPP.

[42]    The Court has reviewed and considered each of Defendants' other arguments. All contentions not addressed herein are rejected. Similarly, it is unnecessary to address Plaintiff's other arguments.

## V.    CONCLUSION AND ORDER

The Court will not consider any Summary Plan Descriptions submitted by Defendants to this Court to limit the SSPP.  The SSPP does not grant discretion to the Plan Administrator to interpret the SSPP terms.  After reviewing the Committee's decision to deny benefits under a *de novo* standard, the Court concludes that the Committee erred in denying Plaintiff Leon McClure's claim for severance benefits.  The record demonstrates that McClure is eligible for severance benefits under the Voluntary Separation Clause of the SSPP because the duties, authority, or responsibilities of his UCC position were reduced in connection with a change in control of his employer.  Accordingly, the Court reverses the Committee's denial decision and awards severance benefits to McClure.  There is no need to remand the case to the Plan Administrator.  The Court will hold an evidentiary hearing to determine the amount of benefits to which Plaintiff is entitled.   It is therefore

ORDERED that Plaintiff's Motion to Remand to the Plan Administrator [Doc. # 72] is **DENIED.**  It is further

ORDERED that Plaintiff's Motion to Exclude [Doc. # 77] is **GRANTED.**   It is further

ORDERED that Plaintiff's Motion for Reconsideration [Doc. # 69] is **GRANTED IN PART**.  It is further

ORDERED that Plaintiff's Objections to Exhibits to Defendants' Summary Judgment Response [Doc. # 76] are **OVERRULED.**  It is further

ORDERED that Defendants' Motion for Summary Judgment [Doc. # 48] is

**DENIED.**  It is further

     **ORDERED** that Plaintiff's Amended Motion for Summary Judgment [Doc. # 56] is

**GRANTED.**  It is further

     **ORDERED** that the parties shall **APPEAR** for Docket Call on **June 17, 2005**, at

**4:00 p.m.**  The parties shall **SUBMIT** on **May 31, 2005**, a Joint Pretrial Order in the form

required by the Court's Procedures on the issue of damages to which Plaintiff McClure is

entitled.

     SIGNED at Houston, Texas, this **20th day** of **May, 2005.**

                          Nancy F. Atlas

                    United States District Judge